The CITY OF NEW YORK, Plaintiff,

v.

EXXON CORPORATION, et al., Defendants.

No. 85 Civ 1939 (KC).

United States District Court, S.D. New York.

March 30, 1990.

Christopher A. Amato, Asst. Corp. Counsel, Affirmative Litigation Div., New York City, for plaintiff.

Joseph DiBenedetto, Winston & Strawn, New York City, Lawrence A. Amato, Alcan Aluminum Corp., Cleveland, Ohio, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This Opinion and Order addresses only the two motions currently pending before the Court which involve defendant Refinemet International, Inc. ("Refinemet"), one of the two remaining defendants in this action, along with Alcan Aluminum Corporation. These two motions are the City of New York's ("the City's") motion for summary judgment against Refinemet, and the City's motion for an order withdrawing a

portion of Refinemet's Chapter 11 proceeding from the United States Bankruptcy Court for the Central District of California to this Court. For the reasons stated below, motions are granted in part and denied in part.

## BACKGROUND

The City commenced this action in March of 1985, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., together with various state law claims, against fifteen corporate defendants, charging the defendants with generating hazardous industrial and chemical wastes that were ultimately disposed of at five City landfills. The wastes were transported to the landfills by certain wastehauling companies owned or operated by Russell Mahler. Mahler gained access to the City landfills for the purpose of dumping the waste by bribing an employee of the City's Department of Sanitation. The complaint seeks (i) recovery of the costs incurred to date for evaluating the nature and extent of chemical contamination at the five sites and for emergency measures taken to control the off-site migration of hazardous substances; (ii) a declaratory judgment that defendants are liable for the future costs of investigations and remedial actions at the sites; and (iii) damages for injury to natural resources caused by defendants' wastes.

Although the procedural history of this case is lengthy, that part relevant to defendant Refinemet can be briefly summarized. In June of 1985, Refinemet moved to dismiss the complaint as against it on the ground of lack of personal jurisdiction. The motion was denied in a decision by the late Judge Edward Weinfeld dated April 24, 1986, which also decided motions to dismiss, on various grounds, by other defendants. *City of New York v. Exxon Corp. (Exxon I)*, 633 F.Supp. 609 (S.D.N.Y. 1986).

Most of the defendants, but not Refinemet, then filed three third-party complaints impleading approximately 300 third-party defendants. By order dated January 23, 1987, Judge Weinfeld severed and stayed the third-party actions pending completion of the main action.

In October of 1987, Refinemet filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California. The parties disagreed on whether the City's action against Refinemet was automatically stayed by the filing of the Chapter 11 petition. *See* December 28, 1987 letter from Joseph DiBenedetto, Esq. to Honorable Edward Weinfeld, Exhibit C to Affidavit of Christopher A. Amato, sworn to on August 30, 1989 ("Amato 8/30/89 Aff."); February 17, 1988 letter from Christopher A. Amato to the Court, Exhibit D to Amato 8/30/89 Aff. On June 30, 1988, the City filed a timely proof of claim against Refinemet in the bankruptcy proceeding, informing the bankruptcy court of the existence of the action before this Court and attaching a copy of the Amended Complaint.

On November 23, 1988, this Court approved a Judgment on Consent settling the City's claims against seven of the defendants in this action.[1] *City of New York v. Exxon Corp. (Exxon II)*, 697 F.Supp. 677 (S.D.N.Y.1988). Subsequently, on May 22, 1989, the Court approved two more Judgments on Consent settling the City's claims against an additional six defendants.[2] Since the November 23 and May 22 Judgments eliminate from this action all thir-

---

**1.** The seven defendants participating in the November 23, 1988 settlement were American National Can Corporation, BASF Corporation, Borg–Warner Corporation, Dana Corporation, Ford Motor Corporation, Koppers Company, Inc. and Public Service & Gas Company. Although the Court's decision approving the November 23 settlement was appealed by defendant Exxon Corporation and by third-party defendant Clairol, Inc., those appeals were withdrawn prior to being heard by the Court of Appeals.

**2.** One of the May 22 Judgments settled the City's claims against defendants Carrier Corporation, Chrysler Corporation, Ingersoll–Rand Company and United Technologies Corporation, while the other settled the City's claims against defendants Exxon Corporation and Exxon Research and Engineering Company, Inc.

teen defendants that filed third-party complaints and the Judgments explicitly provide for dismissal of the third-party claims, the only remaining defendants in this action are Refinemet and Alcan Aluminum Corporation.

In its motion for summary judgment against Refinemet, filed on September 6, 1989, the City seeks to hold Refinemet, formerly known as Ag–Met, Inc. ("Ag–Met"), liable for the activities of its wholly-owned subsidiary, Newtown Refining Corporation, of which Russell Mahler was president from November of 1976 to November of 1978. Refinemet acquired what came to be known as Newtown on November 3, 1976, when it purchased a waste oil business, consisting of a sprawling network of seven interrelated corporations, substantially owned and operated by Mahler. The purchased assets and stock were transferred to a wholly-owned subsidiary of Ag–Met named Ag–Met Oil Service, Inc. ("Ag–Met Oil"), which was specifically created by Ag–Met to receive the purchased assets. Affidavit of Russell W. Mahler, sworn to on August 21, 1989 ("Mahler Aff."), ¶ 9. Shortly afterwards, Ag–Met Oil changed its name to Newtown Refining Corporation ("Newtown"). *Id.*

With the exception of one of the seven companies, Northeast Oil Services, Inc. ("Northeast"), of which he owned 75% of the stock, Mahler was the sole shareholder of each of the components of his empire, and served as president of all seven corporations. Mahler Aff. ¶ 4. From approximately 1972 to 1980, Mahler's business involved both reprocessing waste oils and disposing of industrial and chemical wastes picked up from manufacturing facilities in the states of New York, New Jersey, Pennsylvania and Connecticut, among others. *Id.* The disposal component of Mahler's operations involved the illegal dumping in the City landfills of industrial and chemical wastes which could not be reprocessed into saleable oil, as well as the dumping of waste generated by the reprocessing operation itself. *Id.* Access to the landfills was gained through bribery of a Sanitation Department employee. *Id.* ¶ 1.

Until 1977, most of the reprocessing operations were carried out at a Mahler facility located at 37–80 Review Avenue, Long Island City, New York ("the Review Avenue facility"), which also served as the base of operations for the illegal dumping activities. Mahler Aff., ¶ 6. From 1978 onward, the majority of reprocessing operations were split between the Review Avenue facility and another newly acquired facility, located at One River Road, Edgewater, New Jersey ("the Edgewater facility"). *Id.* ¶ 19. Shortly after its acquisition, the Edgewater facility became the command center for illegal dumping activities. *Id.*

The City seeks to hold Refinemet liable for the activities of its subsidiary, Newtown, on two theories. First, the City argues that Refinemet is directly liable under CERCLA as a generator and transporter of hazardous substances disposed of at the City's landfills. Second, the City contends that Refinemet is liable for the acts of its subsidiary under traditional corporate veil-piercing standards.

As indicated above, the City served and filed its motion for partial summary judgment against Refinemet on September 6, 1989. Refinemet requested, and the City consented to, four separate adjournments of the City's motion. The final adjournment set a return date for the City's motion of February 12, 1990. Instead of responding to the City's summary judgment motion, Refinemet filed a motion in the California bankruptcy court on February 8, 1990, asking the bankruptcy court to determine the issue of Refinemet's liability to the City under CERCLA. Although styled as a motion for disallowance of the City's bankruptcy claim, Refinemet's motion is based on the same question underlying the City's motion for partial summary judgment: whether Refinemet is liable for the acts of its subsidiary, Newtown. Refinemet advised the Court by letter dated February 9, 1990, of its motion in the bankruptcy court and requested that the City's motion for summary judgment in this action "be stricken from the calendar." Letter dated February 9, 1990, from Joseph DiBenedetto, Esq. to the Court.

In response to Refinemet's actions, the City brought its motion for an order, pursuant to 28 U.S.C. § 157(d), withdrawing those portions of Refinemet's Chapter 11 proceeding which relate to the City's CERCLA claims, including but not limited to Refinemet's motion for disallowance of the City's bankruptcy claim. The City initially brought this motion by order to show cause, which was necessitated by the fast-approaching return date of Refinemet's bankruptcy motion. We held oral argument on the motion on February 26, 1990. At the hearing, Refinemet agreed to adjourn the return date of its motion in the California bankruptcy court, and we ordered Refinemet to respond to the City's motion for partial summary judgment in this Court. That response, and the City's reply, have since been served and filed.

The issues raised by these prior proceedings, and which will be addressed below, include: 1) whether withdrawal of the reference is appropriate; 2) whether the automatic stay applies; 3) whether partial summary judgment is appropriate; and 4) whether we should enjoin the proceedings in California pending the outcome of this action.

## DISCUSSION

### I. *Withdrawal of the Reference*

■ As we indicated at the hearing on February 26, 1990, we do not think it appropriate, nor indeed possible, to withdraw a reference to a bankruptcy court which we did not make. Pursuant to 28 U.S.C. § 157(a), "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11

shall be referred to the bankruptcy judges for the district." In turn, subsection (d) of Section 157, on which the City relies, provides:

The district court may withdraw, in whole or in part, any case or proceeding referred under this section ... The district court shall so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other law of the United States regulating organizations or activities affecting interstate commerce.

As Refinemet points out, it makes no sense for the district court in the district where the bankruptcy is pending to have the discretion to "refer" a bankruptcy case under subsection (a) "to the bankruptcy judges for the district," and at the same time to allow, as the City suggests, any district court in the United States to "withdraw" that reference pursuant to subsection (d). Memorandum in Opposition to Motion to Withdraw Reference at 7.

Moreover, the Bankruptcy Rules provide that "[t]he proofs of claim or interest, complaints, motions, applications, objections and other papers required to be filed by these rules ... shall be filed with the clerk in the district where the case under the Code is pending." Bankruptcy Rule 5005(a). Thus, because the District Court for the Central District of California "referred" the Refinemet Chapter 11 proceeding to its own bankruptcy court, pursuant to its own standing rules and procedures, only the California district court, and not this Court, can withdraw the reference, and a motion to withdraw the reference would properly be filed in the Central District of California.[3] Accordingly, the City's motion

---

**3.** Although we cannot withdraw the reference from the California Bankruptcy Court, we believe that withdrawal by the California district court would be appropriate. Withdrawal of the reference under Section 157(d) of the Bankruptcy Code can be either discretionary or mandatory. The City urges mandatory withdrawal, the test for which has been narrowly defined:

[W]ithdrawal is mandatory only when "substantial and material consideration" of non-Code federal statutes "is necessary for the *resolution* of a case or proceeding".... [M]andatory withdrawal should be exercised

only for "issues requiring significant *interpretation* of federal laws that Congress would have intended to have decided by a district judge rather than a bankruptcy judge".... In such cases, a district court does not have discretion to deny a petition for withdrawal. *Pension Benefit Guaranty Corp. v. LTV Corp.,* 86 B.R. 33, 36–37 (S.D.N.Y.1987) (citations omitted; emphasis in original). The City argues that, since its motion requires determination of (1) whether Refinemet is a "responsible person" within the meaning of CERCLA; (2) whether a

for mandatory withdrawal of the reference is denied.[4]

## II. *Applicability of the Automatic Stay*

Refinemet asserts that the City's action against Refinemet was automatically stayed by the filing of the Chapter 11 petition in California. The automatic stay provision of § 362(a) of the Bankruptcy Code provides, in relevant part, that the filing of a petition in bankruptcy operates as a stay of:

> [t]he commencement or continuation ... of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title.

11 U.S.C. § 362(a)(1). However, Section 362(a) is expressly limited by Section 362(b), which provides:

> (b) the filing of a petition under section 301, 302 or 303 of this title ... does not operate as a stay—
>
> \* \* \* \* \* \*
>
> (4) ... of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;
>
> (5) ... of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

11 U.S.C. § 362(b).

The City contends that because it is a governmental unit which is merely attempting to fix damages, and not attempting to execute or enforce a money judgment, the automatic stay does not apply. *See United States v. Nicolet (Nicolet I )*, 857 F.2d 202, 207–09 (3d Cir.1988). A reading of the legislative history clearly favors the City's position. The Senate and House Committee Reports use identical language in describing the intended effect of the police and regulatory exception. The reports state that "where a governmental unit is suing a debtor to prevent or stop violation of fraud, *environmental protection*, consumer protection, safety, or similar police or regulatory laws, *or attempting to fix damages for violation of such a law*, the action or proceeding is not stayed under the automatic stay." S.Rep. No. 989, 95th Cong., 2d Sess. 52 (1978) (emphasis added), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5838; H.R.Rep. No. 595, 95th Cong., 1st Sess. 343 (emphasis added), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6299.

The reports reiterate this same theme in discussing the enforcement provision in subsection (5): "Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the *entry* of a money

---

parent corporation can be held liable as an owner/operator under CERCLA; and (3) the extent of control over the subsidiary necessary for a parent corporation to be held liable, the reference should be withdrawn, because all three of these issues require significant interpretation of CERCLA.

In support of its position, the City cites several cases from this district in which deciding the issue before the court would involve reconciling conflicting provisions of CERCLA and the Bankruptcy Code. *See American Telephone and Telegraph Company v. Chateaugay Corp.*, 88 B.R. 581 (S.D.N.Y.1988) (resolution of issue of when CERCLA claim arose was open question that would require analysis of competing policies embodied in CERCLA and Bankruptcy Code); *In re Combustion Equipment Assocs., Inc.*, 67 B.R. 709 (S.D.N.Y.1986) (same); *In re Johns–Manville Corp.*, 63 B.R. 600 (S.D.N.Y. 1986) (same). In the case before us, such a

conflict between the Code and CERCLA does not exist; nevertheless, the City correctly argues that resolving the summary judgment motion (which parallels determining whether or not to disallow the City's claim in bankruptcy) will require substantial interpretation of CERCLA. This is sufficient to require mandatory withdrawal of the reference. *See Pension Benefit Guaranty Corp. v. LTV Corp.*, 86 B.R. at 36–37; *In re Johns–Manville Corp.*, 63 B.R. at 602; *Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.*, 107 B.R. 34, 37–38 (D.Del.1989) (collecting cases); *In re White Motor Corporation*, 42 B.R. 693, 704 (N.D.Ohio 1984).

**4.** We note, however, that, following our discussion of the appropriateness of partial summary judgment on the issue of liability, we consider whether or not it is necessary to enjoin the California bankruptcy proceeding.

judgment, but does not extend to permit enforcement of a money judgment." S.Rep. No. 959, at 52 (emphasis added), 1978 U.S.Code Cong. & Admin.News at 5838; H.R.Rep. No. 595, at 343 (emphasis added), 1978 U.S.Code Cong. & Admin. News at 6299.

■ The language of the exception to the stay and the legislative history lead us to agree with other courts who have held that, when a governmental plaintiff in a CERCLA action is attempting to fix damages, the automatic stay does not apply. *See, e.g., Nicolet I,* 857 F.2d at 209 ("[T]hat Congress carefully made only enforcement of a money judgment subject to the automatic stay indicates strongly that mere entry of the judgment was not intended to be proscribed."); *Penn Terra Ltd. v. Dep't of Environmental Resources,* 733 F.2d 267, 278–79 (3d Cir.1984) (automatic stay does not apply to governmental action for injunctive relief, even if complying with injunction will cause estate to incur expenses); *United States v. Mattiace Indus., Inc.,* 73 B.R. 816, 818, 26 Env't Rep.Cas. (BNA) 1484, 1487 (E.D.N.Y.1987) (CERCLA cost recovery actions are exempted from the stay).

Refinemet responds, first, that the City is not a governmental unit for purposes of its claims pursuant to subsections (A) and (C) of Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4)(A) and (C); and second, that the City's "private" claim for relief under subsection (B) of Section 107(a)(4) is primarily based on the City's pecuniary interests, and, as such, falls within the so-called "pecuniary-purpose" exception to Section 362(b)(4) of the Bankruptcy Code.[5] Neither of these arguments is persuasive.

Refinemet's first argument is an attempt to circumvent our reasoning in our prior opinion, *Exxon II,* in which we upheld the Judgments on Consent. Refinemet con-tends that our holding in *Exxon II,* in which we determined that the City had standing as a "State" under CERCLA, applied only to Section 113(f)(2) of CERCLA. In other words, Refinemet claims that the City's standing under Section 107(a)(4)(A) and (C), as a "governmental unit" or governmental plaintiff, has never been determined. In *Exxon II,* however, we rejected Exxon's "view that the City cannot proceed as a 'State' under § 107(a)(4)(A) of CERCLA." 697 F.Supp. at 683. We titled the section of the opinion which considered the issue of the City's standing: "The City's Standing Under §§ 107(a)(4)(A) and 113(f)(2)." *Id.* We further stated, "Exxon asserts that Congress must have intended to limit enforcement actions by municipalities to § 107(a)(4)(B) ... The Court cannot agree." *Id.* at 684. In rejecting Exxon's assertion, the Court noted that "a broad reading of sections 107(a)(4)(A) and 113(f)(2) is entirely consistent with the overall purpose of the Act." *Id.* at 686. Even if Refinemet's assertion, that these references to Section 107(a) in *Exxon II* were merely dicta, is correct, we now hold that the City does have standing as a governmental plaintiff under Section 107(a)(4)(A) and (C) of CERCLA, based on our prior reasoning in *Exxon II.*

Refinemet's second argument, that the City's claims under Section 107(a)(4)(B) should be stayed because they are based on the City's private, pecuniary interests, overlooks the fact that the City's claims under this section are in the alternative to its claims under Section 107(a)(4)(A). *See, e.g.,* Amended Complaint ¶ 58. The City pleaded its Section 107(a)(4)(B) claims to guard against the possibility that this Court would decide that the City did not have standing as a governmental plaintiff. Again, we remain satisfied that the City has standing as a governmental plaintiff.

---

5. Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), provides, in relevant part, that persons who fit into one of the four categories listed in subsections (1)–(4) shall be liable for:
 (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and
 (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such release.

Accordingly, we find that the automatic stay does not apply, because the City's cause of action under CERCLA falls within the exception to the automatic stay. As the court observed in *Mattiace Industries,* government actions under CERCLA, whether for injunctive relief or for recovery costs, damages and penalties, are brought pursuant to a statute that was clearly enacted to protect the health, safety and welfare of the public.... Even where the United States seeks punitive damages or reimbursement of Superfund cleanup costs in addition to or in lieu of injunctive relief, thereby arguably protecting its own pecuniary interest, the deterrence function of the relief sought will render the action one to protect the public health, safety, and welfare.

73 B.R. at 819, 26 Env't Rep.Cas. at 1487 (citations omitted). Here, where the City seeks reimbursement of cleanup costs under CERCLA, the City's action is exempt from the automatic stay because it is undertaken pursuant to the police or regulatory powers of a governmental unit. 11 U.S.C. § 362(b)(4) and (5).

III. *Appropriateness of Partial Summary Judgment*

As indicated earlier, the City seeks partial summary judgment against Refinemet, holding it directly liable as a "person" [6] who arranges for the transportation and disposal of hazardous substances,[7] or accepts hazardous substances for transport to disposal or treatment facilities, pursuant to Section 107(a)(3) and (4), respectively,[8] of CERCLA, 42 U.S.C. § 9607(a)(3) and (4). In the alternative, the City seeks to hold Refinemet indirectly liable, as the parent

corporation of Newtown, using traditional corporate veil-piercing standards.

Turning first to the question of direct liability under CERCLA, we note that the Second Circuit and numerous courts in other jurisdictions have held that officers and shareholders of polluting corporations may be held directly and personally liable under CERCLA. *See State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985); *United States v. Northeastern Pharmaceutical and Chemical Co., Inc. (NEPACCO),* 810 F.2d 726, 744 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Medley,* 25 Env't Rep.Cas. (BNA) 1315, 1317–18 (D.S.C.1986); *United States v. Ward,* 618 F.Supp. 884, 894–96 (E.D.N.C. 1985); *United States v. Mottolo,* 605 F.Supp. 898, 913–14 (D.N.H.1985); *but see Joslyn Manufacturing Co. v. T.L. James & Co., Inc.,* 893 F.2d 80, 82 (5th Cir.1990). These holdings are consistent with CERCLA's goal of "plac[ing] the ultimate responsibility for cleanup on those responsible for problems caused by the disposal of chemical poisons." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986).

Courts have held officers and shareholders, individual and corporate, accountable under CERCLA in a variety of circumstances. *See, e.g., Shore Realty,* 759 F.2d at 1052 (imposing liability on "an owning stockholder who manages" the corporate owner of a hazardous waste site); *Medley,* 25 Env't Rep.Cas. at 1318 (imposing liability on "[i]ndividuals who have control or authority over the activities of a facility from which a hazardous substance has been released ... or who participate in the

---

**6.** Under CERCLA, "person" includes corporations. 42 U.S.C. § 9601(21).

**7.** A person who arranges for the transportation and disposal of hazardous substances is sometimes referred to as a "generator" of hazardous substances.

**8.** Section 107(a)(3) and (4) of CERCLA, 42 U.S.C. § 9607(a)(3) and (4), provide that:

(3) any person who by contract, agreement, otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous sub-

stances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, ...

shall be liable for response and removal costs as outlined in Section 107(a)(4)(A)–(C).

management of such a facility"); *United States v. Conservation Chemical*, 619 F.Supp. 162, 188 (W.D.Mo.1985) ("corporate officials who actively participate in the management of a disposal facility can be held personally liable" as owners and operators under CERCLA); *Colorado v. Idarado Mining Co.*, 18 Envtl.L.Rep. (Envtl L.Inst.) 20578, 20579 (D.Colo.1987) (parent corporation liable under CERCLA as the owner and operator of its subsidiary's hazardous waste site due to its "intimate involvement" in its subsidiary's business activities).

In most of the cases cited above, the courts considered liability of the shareholder or parent corporation under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), which makes liable "any person who at the time of disposal of any hazardous substance *owned or operated* any facility at which such hazardous substances were disposed of...." (emphasis added). The City, however, has stated claims against Refinemet pursuant to Section 107(a)(3) and (4) of CERCLA, 42 U.S.C. § 9607(a)(3) and (4), which make liable persons who generate or arrange for the transport and disposal of hazardous materials. Nevertheless, the City contends, the analysis leading to a finding of direct liability on the part of shareholders or parent corporations under Section 107(a)(3) and (4) is similar to the analysis under Section 107(a)(2). Memorandum of Plaintiff the City of New York in Support of Its Motion for Partial Summary Judgment against Defendant Refinemet International, Inc. ("Pltf.Mem.") at 18.

We agree. Courts considering the direct, personal liability of corporate officers or shareholders as transporters or generators of hazardous wastes under Section 107(a)(3) and (4) emphasize the degree of control over and actual participation by the corporate officer or shareholder in the affairs of the corporation. For example, in *NEPACCO*, the Eigth Circuit affirmed the district court's findings of liability under CERCLA against an individual defendant who was vice-president, shareholder, and supervisor of NEPACCO, a chemical manufacturing company. "The district court found that the defendant, as plant supervisor, actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal" of hazardous substances. *NEPACCO*, 810 F.2d at 743. Even though the defendant did not own or possess the hazardous substances, he was liable, because "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme." *Id. See also Ward*, 618 F.Supp. at 894 ("corporate officer of company who exercises authority for the company's operations and participates in arranging for the disposal of hazardous wastes is liable under § 107(a)(3) for clean-up cost," without a finding of knowing involvement by the individual defendant); *Mottolo*, 605 F.Supp. at 913–14 (if president, treasurer, and sole shareholder of defendant corporation arranged for disposal of hazardous waste, a disputed factual matter, he could be held personally liable, even if he did not own or possess the waste).

Similarly, actual participation in and authority or control over the affairs of a subsidiary or corporation are key factors in determining whether to hold a parent corporation or individual shareholder liable as an owner or operator, pursuant to Section 107(a)(2).[9] *See, e.g., Shore*, 759 F.2d at

---

9. Some courts emphasize the actual exercise of control as opposed to the mere capacity to control. For example, in *United States v. Consolidated Rail Corp.*, 729 F.Supp. 1461 (D.Del. 1989), the court states that "the statute requires that a person be actively participating in the management of the facility to be held liable for the disposal of hazardous wastes. The 'mere ability to exercise control as a result of the financial relationship of the parties is insufficient for liability to attach.'" *Id.* at 1468 (quoting *United States v. Mirabile*, 10 Chem. & Rad.

Waste Lit.Rep. 688, 670–71 (E.D.Pa.1985)). *See also Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1543 (W.D.Mich.1989) (suggesting that a court "should weigh the factors of the corporate individual's degree of authority in general and specific responsibility for health and safety practices, including hazardous waste disposal.... to answer the question of whether the individual in the close corporation could have prevented or significantly abated the hazardous waste discharge that is the basis of the claim").

1052 (owning and managing shareholder of corporation who knew waste was stored on site liable as owner/operator); *Idarado Mining*, 18 Envtl.L.Rep. at 20578–79 (parent corporation sufficiently involved in subsidiary's business activities to be held liable under CERCLA as the owner and operator of its subsidiary's hazardous waste site); *Medley*, 25 Env't Rep.Cas. at 1318 (CERCLA imposes owner/operator liability on "[individuals who have control or authority over the activities of a facility from which a hazardous substance has been released … or who participate in the management of such a facility"); *United States v. Carolawn Co.*, 21 Env't Rep.Cas. (BNA) 2124, 2131 (D.S.C.1984) ("to the extent that an individual has control or authority over the activities of a facility from which hazardous substances are released or participates in the management of such a facility, he may be held liable *for* response costs incurred at the facility notwithstanding the corporate character of the business").

Thus, evaluating the degree of participation and control, courts have found parent corporations directly liable for the activities of their subsidiaries. For example, in *United States v. Kayser–Roth Corp.*, 724 F.Supp. 15 (D.R.I.1989), the court held Kayser–Roth, the parent corporation, liable as an owner and operator, based on evidence adduced at trial which established that Kayser–Roth 1) had total monetary control over its subsidiary accounts receivable, 2) placed restrictions on its subsidiary's financial budget, 3) controlled its subsidiary's contact with the government on environmental matters, 4) approved all of its subsidiary's capital expenditures in excess of $5,000 and real estate transactions, and 5) placed its own personnel in its subsidiary's officer and director positions. *Kayser–Roth*, 724 F.Supp. at 22–23. Moreover, Kayser–Roth knew that its subsidiary used a scouring system which used TCE, a hazardous substance, and approved of the installation of that system. *Id.* These facts established sufficient domination of and participation in the affairs of the subsidiary to hold the parent directly liable under CERCLA.

In *State of Idaho v. Bunker Hill Co.*, 635 F.Supp. 665 (D. Idaho 1986), the court, on a motion for summary judgment, held the parent corporation liable as an owner and operator, citing, on the issue of control, the parent corporations control over its subsidiary's management decisions, undercapitalization of the subsidiary by the parent, consolidated tax returns, and weekly reports on day-to-day operations by the subsidiary to the parent, factors which indicated that the parent had the capacity to control the subsidiary. *Id.* at 670. The court also found that the parent was in a position to be, and was, intimately familiar with the hazardous waste disposal at its subsidiaries facility, and that the parent had the capacity, if not the total reserved authority, to make decision and implement actions and mechanisms to prevent and abate such releases. *Id.* at 672.

The issue before us, then is whether Refinemet was "so intimately involved in the operation" of Newtown, *see Idarado Mining*, 18 Envtl.L.Rep. at 20578–79, with a sufficient degree of control over and participation in Newtown's affairs, that it is liable as a transporter, or as a person who arranges for the transport and disposal, of hazardous wastes, pursuant to Section 107(a)(3) and (4) of CERCLA.

We agree that the mere capacity to control the affairs of a subsidiary is not a sufficient basis on which to predicate direct liability under Section 107(a) of CERCLA. We believe that some degree of active participation in and actual control over the affairs of the subsidiary is necessary, for we are mindful that "care must be taken so that 'normal' activities of a parent with respect to its subsidiary do not automatically warrant finding the parent an owner or operator." *State of Idaho v. Bunker Hill*, 635 F.Supp. 665, 672 (D.Idaho 1986). Thus, while the parent corporation's capacity to discover in a timely fashion the release or threat of release of hazardous substances, the parent corporation's power to direct mechanisms causing the release, and the parent corporation's capacity to prevent and abate the damage, are certainly relevant and material factors to consider in evaluating a parent corporation's potential liability, *see United States v. Kayser–Roth Corp.*, 724 F.Supp. 15, 21 (D.R.I.1989); *Bunker Hill*, 635 F.Supp. at 672, the corporation must exercise its power or capacity to control its subsidiary in order to be held liable under Section 107(a).

The City argues that Refinemet's control over and participation in the affairs of Newtown was extensive and pervasive enough to hold Refinemet liable for Newtown's activities as a matter of law. Refinemet denies that it can be held liable for Mahler's "midnight dumping operation," Refinemet International Company's Memorandum of Law and Supporting Affidavits ("Def.Mem.") at 34, and opposes partial summary judgment on the ground that material issues of fact exist as to the extent of its involvement in Newtown's affairs.

Summary judgment may be granted only when the moving party can establish, based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The Court must first look to the substantive law of the case to determine which facts are material. Only disputes over material facts will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that no genuine dispute as to material facts exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to show that a genuine issue of fact exists. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

As a preliminary matter, we emphasize that Refinemet acquired Newtown fully aware that Mahler's business exclusively involved reprocessing waste oils and disposing of industrial and chemical wastes picked up from manufacturing facilities in the states of New York, New Jersey, Pennsylvania and Connecticut, among others. In short, Newtown's business consisted solely of handling wastes, and Refinemet fully expected to profit from Newtown's waste handling operations. As reflected in a report prepared by one of Refinemet's accountants, Robert Macri, in late October or early November of 1978, Newtown's waste disposal business was widespread in the Northeast, with weekly pickups from dozens of locations. Affidavit of Robert Macri, sworn to on March 7, 1990 ("Macri Aff."), Ex. A.

To establish Refinemet's control over and participation in the affairs of Newtown, the City points in part to the following uncontradicted facts, which are based largely on the affidavit of Russell Mahler: 1) Newtown was a wholly-owned subsidiary of Refinemet; 2) Refinemet had the power to appoint Newtown's officers and directors, to replace them as it saw fit, and to augment them with its own personnel; 3) Newtown and Refinemet had certain directors and officers in common, including Russell Mahler (director of Refinemet, president of Newtown), Gerald Cohn (director and president of Refinemet, director of Newtown), Theodore Muller (director and then president, after Gerald Cohn, of Refinemet, director of Newtown), and Arthur Brandenburg (director and vice-president for finance of Refinemet, same for Newtown); 4) Refinemet funded Mahler's salary while he was president of Newtown; 5) Refinemet had ultimate authority over all of Newtown's major expenditures; 6) Refinemet negotiated the purchase of fifteen trucks by Newtown, arranged financing for the purchase, and guaranteed the loan for the purchase; 7) Refinemet guaranteed another of Newtown's loans, for $200,000; 8) Refinemet contributed $3 million in cash to Newtown's operations in eighteen months, because Newtown was losing several million dollars per year; 9) Refinemet occasionally had direct contacts with Newtown customers regarding their

accounts; and 10) Refinemet paid for Newtown's insurance coverage. These facts establish that Refinemet's control over Newtown's affairs was pervasive.

Yet, despite these uncontroverted facts, Refinemet denies that it had control over Newtown's actions. According to Arthur Brandenburg, formerly vice-president and chief financial officer for Refinemet, Refinemet was a holding company to many subsidiaries which conducted no operations of its own. Each subsidiary had operational control over its own activities, with executive authority vested in the subsidiary's president. Affidavit of Arthur Brandenburg, sworn to on March 2, 1990 ("Brandenburg Aff."), ¶ 2. Thus, "Russell Mahler was in charge of all operations conducted by the subsidiary, including daily supervision of the various terminals through which Newtown conducted business, the negotiation of all contracts with vendors, the negotiation and consummation of purchases and sales, and the hiring and firing of employees." *Id.* ¶ 7.

Brandenburg's conclusory, self-serving, and generalized description of the relationship between Refinemet and Newtown is simply inconsistent with the undisputed, specific facts, outlined above, regarding Refinemet's control over Newtown. More importantly, Refinemet does not dispute that Mahler was a member of its own Board of Directors, Mahler Aff. ¶ 10, or that Refinemet paid his salary, indicating that Mahler was, in essence, acting on behalf of Refinemet.

Given Refinemet's pervasive control over and participation in Newtown's affairs, and the fact that Newtown's business consisted solely of reprocessing and disposing of wastes, it is inconceivable that Refinemet was unaware that Newtown was dumping hazardous waste. Indeed, Refinemet's awareness of Newtown's dumping activities is uncontradicted. Mahler asserts that the dumping expenses were reflected in Newtown's accounting records after the acquisition by Refinemet. Mahler Aff. ¶¶ 29–30 and Exhibit F (expense records indicating miscellaneous expenses for "landfills"). Refinemet does not deny this fact; it merely asserts that "there is nothing in these documents to indicate that these payments were in any way illegal." Brandenburg Aff. ¶ 17. Under CERCLA, whether or not Refinemet knew that the payments were illegal is irrelevant.[10]

To establish that Refinemet was fully aware of Newtown's dumping activities, the City also relies on the testimony, in the *Commonwealth of Pennsylvania v. Scatena* trial, of two former Newtown officers, who were appointed by Refinemet, to apprise it of Newtown's operations, in particular, the reason for Newtown's substantial financial losses. Thus, the two former officers regularly reported to Refinemet's Board of Directors, keeping it abreast of Newtown's activities. One of these former officers is Charles Piscatelli, who was initially hired in October of 1978 by Refinemet as a consultant and then succeeded Mahler as president of Newtown in November

---

**10.** Because liability under CERCLA is strict, *Shore Realty,* 759 F.2d at 1044, a defendant "cannot avoid liability under section 107(a) by contending that he did not know that the substances disposed of were hazardous substances. CERCLA imposes strict liability upon responsible parties without regard to the defendant's culpability or state of mind, subject only to the three limited defenses set forth in section 107(b)." *United States v. Bliss,* Nos. 84–2086C(1), 87–1558C(1), 84–1148C(1) and 84–2092C(1) (E.D.Mo. September 27, 1988) (available on Westlaw, 1988 WL 169818) (citing, *inter alia, Shore Realty,* 759 F.2d at 1044; *United States v. Bliss,* 667 F.Supp. 1298, 1304 (E.D.Mo. 1987); *United States v. Conservation Chemical,* 589 F.Supp. 59, 62 (W.D.Mo.1984)).

Consequently, whether or not Mahler's claim "that his unlawful disposal of hazardous waste

at New York City landfills and his bribery of New York City officials were disclosed at [Refinemet] Board meetings" is "categorically untrue," Brandenburg Aff. ¶ 18; *see also* Affidavit of Theo Muller, sworn to on March 5, 1990 ("Muller Aff."), ¶ 10; Affidavit of Gerald Cohn, sworn to on March 9, 1990 ("Cohn Aff."), ¶ 2, is also irrelevant. At any rate, the statements from Brandenburg, Muller and Cohn do not directly contradict Mahler's statement, since Mahler only asserts that the question of the legality was raised, Mahler Aff. ¶ 31, not that the illegality was disclosed. Accordingly, we infer that the subject of waste disposal was an affirmative concern of Refinemet, as reflected in the Board's discussions.

of 1978. Piscatelli testified that he understood that Newtown was dumping waste:

Q: In your experience were the records correct in so far as dump sites were concerned and what was being dumped?

A: Correct. The records were correct as to where the transports came from and where they went to. The questions I constantly had was why was a transport sitting in the yard overnight full. The driver would be paid a double trip sometimes which would indicate he came from Point A to the yard and then from the yard to dump point and I always would question why didn't he just go to the dump point.

Amato Aff. of August 30, 1989, Ex. B. at 959.

The other employee, Clarence Joseph Guidroz, was employed from April to November of 1978 as Newtown's vice-president of finance and administration, and routinely and regularly advised Refinemet's Board on Newtown's financial expenditures. Amato Aff. of August 30, 1989, Ex. A at 918–19. Guidroz was plainly aware

that cash payments were being made by Newtown for dumping:

Q: Did it come to your attention that any of these documents revealed a payment of $150.00 or $200.00 for the purpose of dumping this material, of a cash payment?

A: The dumping payments were generally made in cash.

* * * * * *

Q: What was the expediency in that cash arrangement?

A: My understanding was that that would be the only way that we would be allowed to dump is to pay cash for the dumping.

Id. at 934–35.[11] Guidroz, then, admittedly knew of Newtown's dumping. As noted above, Guidroz was employed at Newtown from April to November of 1978. Because Guidroz reported regularly to Brandenburg about Newtown's financial affairs, which included "dumping expenses," Refinemet was also undeniably aware of Newtown's dumping activities.[12]

---

11. Although, as we have discussed, see *supra* footnote 10, it is irrelevant whether Refinemet knew that the disposal practices were illegal, we note that Guidroz also conceded that Newtown's disposal practices were of questionable legality:

Q: Were you aware, did you either hear it during the course of your employment, did you not hear of the fact that there was illegal dumping being done by the drivers for the company, Newtown?

A: I heard rumors and comments that it was possible.

As the City observes, any suspicions Guidroz may have had concerning the legality of Newtown's disposal practices should have been confirmed by his own investigation into Newtown's expenditures for truck tires:

Q: Well, tell us about that?

A: Well, you know, my problem was that we were having very high bills for tires and I couldn't understand why our tires were costing so much, and on investigation, I found out that the reason was that we were dumping at night and they couldn't see what they were backing over and so they were destroying tires and I thought that was rather unusual that we would be dumping at night. At that point in time that was about the time I left the company.

*Id.* at 939.

12. Refinemet asserts that it first learned of the *illegality* of Newtown's dumping activities in late October of 1978. According to Brandenburg

and Muller, Refinemet was concerned about Newtown's financial condition, because Newtown had been losing several million dollars per year. Brandenburg Aff. ¶ 4; Muller Aff. ¶ 4. To determine the source of the trouble, Refinemet sent first Guidroz, in April of 1978, and then, in the fall of 1978, Robert Macri and John Brown, Refinemet accountants, to investigate. Brandenburg Aff. ¶¶ 8, 11. Macri asserts that, during his stay in Edgewater, he and Brown discovered from Kenneth Mansfield, the Edgewater dispatcher, that Newtown was transporting chemical waste and dumping it illegally into an abandoned mine shaft in Scranton, Pennsylvania. Macri Aff. ¶ 3. Macri and Brown reported this discovery to Brandenburg, who instructed them to prepare a written report. *Id.* Macri's report, prepared in late October or November of 1978, based on further conversations with Mansfield, reveals the broad scope of Newtown's dumping activities. *Id.* and Ex. A.

Upon receiving the report, Refinemet ordered Mahler to cease all illegal dumping activities. Brandenburg Aff. ¶ 12. Three weeks later, Refinemet removed Mahler as president of Newtown, and replaced him with Piscatelli. *Id.* ¶ 13. On January 10, 1979, Refinemet sold Newtown back to Russell Mahler, "at a fraction of the price which Mahler received when he initially sold them in 1976." *Id.*

As we have indicated earlier, it is irrelevant whether or when Refinemet was aware of the "illegality" of Newtown's dumping operation.

In summary, it is undisputed that Refinemet acquired Newtown in 1976, fully aware that Mahler's business involved exclusively the reprocessing of waste oils and the disposal of industrial and chemical wastes, and that Refinemet expected to profit handsomely from these activities. It is further undisputed that agents and officers of Refinemet, through an interlocking directorship with Newtown, which included the presence of Mahler on Refinemet's Board of Directors, routinely and continuously scrutinized operational standards and controls by which the waste removal activities were carried out. Faced with these undisputed facts, Refinemet's characterization of itself as a detached, unaware parent holding company concerned with no more than its subsidiary's financial condition, until faced with concrete evidence of its illegal dumping activities in the fall of 1978, is simply untenable. Moreover, we firmly believe that Refinemet, as a parent corporation extensively involved in the affairs of its subsidiary, whose business centered on waste disposal, had an affirmative duty to ensure that its subsidiary was properly protecting the public from the environmental health and safety hazards inherent in reprocessing waste oils and disposing of industrial and chemical wastes.[13] Refinemet cannot escape direct liability under CERCLA by invoking the protection of the corporate veil and by professing ignorance of the illegality of Newtown's activities.

■ Taking the record before us as a whole, we conclude that Refinemet was sufficiently involved in the affairs of its subsidiary, Newtown, to be held directly liable as a generator or transporter of hazardous wastes. Because we are satisfied that no reasonable juror could conclude otherwise, the City's motion for partial summary judgment against Refinemet, on the issue of Refinemet's direct liability under CERCLA, is granted. *See Anderson v. Liberty Lobby*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12.

Because we hold that Refinemet is directly liable under CERCLA, we need not consider whether Refinemet is indirectly liable under traditional corporate veil-piercing standards. We note, however, that we would hold Refinemet liable under this theory as well. As a preliminary matter, we observe that our analysis of this theory of liability would be governed by federal common law, since "[i]t is well established that when a federal statute is silent as to the choice of law to be applied, but overriding federal interests exist, courts should fashion uniform federal rules of decision." *United States v. Nicolet (Nicolet II )*, 712 F.Supp. 1193, 1201 (E.D.Pa.1989) (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943)). As one court stated:

> In attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide problem. One can hardly imagine a federal program more demanding of national uniformity than environmental protection. Congress did not intend that the ability of the executive to fund the cleanup of hazardous waste sites should depend on the attitudes of the several states toward parent-subsidiary liability in general, or CERCLA in particular. The need for a uniform rule is especially great for questions of piercing the corporate veil, since liability under the statute must not depend on the particular state in which a defendant happens to reside.

*In re Acushnet River & New Bedford Harbor Proceedings*, 675 F.Supp. 22, 31 (D.Mass.1987). Accordingly, federal common law standards on piercing the corpo-

---

See *supra* footnote 10. The only relevant and material considerations are whether Refinemet was aware of Newtown's waste disposal business, and whether Refinemet was sufficiently involved in or controlling Newtown's activities to be held liable as a transporter or generator of hazardous wastes under CERCLA.

**13.** Even though CERCLA, the current source of such a duty, was not enacted until after Refi-

nemet sold Newtown, we note that CERCLA is applied retroactively. *See NEPACCO*, 810 F.2d at 732–34 (citing cases). Thus, it is entirely appropriate, we believe, to impose upon Refinemet the duties and obligations to the public health, safety, and welfare, which are embodied in CERCLA.

rate veil would be applicable.[14]

The federal common law in this area emerges from the general principle that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981) (quoted in *Acushnet*, 675 F.Supp. at 33). In considering whether or not to pierce the corporate veil under CERCLA, courts have considered several factors, including, in approximate descending order of importance: 1) inadequate capitalization in light of the purposes for which the corporation was organized; 2) extensive or pervasive control by the shareholder or shareholders; 3) intermingling of the corporation's properties or accounts with those of its owner; 4) failure to observe corporate formalities and separateness; 5) siphoning of funds from the corporation; 6) absence of corporate records; and 7) nonfunctioning officers or directors. *Acushnet*, 675 F.Supp. at 33 (citations omitted). "No one of these factors is either necessary or sufficient to disregard corporate separateness. The equitable decision to pierce the veil is dependent on the facts peculiar to each case." *Id.*

■ On the facts before us, we would find it appropriate to pierce the corporate veil between Refinemet and Newtown. As indicated earlier, it is undisputed that Refinemet's involvement in and control over Newtown's affairs was pervasive. In addition, as we have discussed, see *supra* at 553, Refinemet was undoubtably aware of its subsidiary's dumping activities. As to corporate formalities, it is undisputed that

Newtown's Board of Directors, consisting of Refinemet officers and directors, never met. In addition, Newtown's customers occasionally communicated directly with Refinemet, indicating that corporate separateness between Refinemet and Newtown was not strictly observed; Refinemet paid for Mahler's salary; Refinemet contributed over $3 million to Newtown's operations; Refinemet guaranteed at least two of Newtown's loans and paid its insurance; and Refinemet's approval was required for all of Newtown's major financial undertakings.

The conclusory statements in the affidavits of Brandenburg and Muller, to the effect that "corporate formalities were always observed," Brandenburg Aff. ¶ 13, Muller Aff. ¶ 11, are plainly self-serving and not sufficient to contradict the facts outlined above.[15] Under these circumstances, no reasonable juror could find Refinemet not liable for the activities of its subsidiary, Newtown, under traditional veil piercing standards.

## IV. *Enjoining the California Bankruptcy Proceeding*

Having determined that the City is entitled to partial summary judgment against Refinemet on the question of liability under CERCLA, we are left with the question of the appropriate measure of relief. As explained earlier, the City seeks a judgment as to Refinemet's liability for the City's response costs to date, and a declaratory judgment[16] as to liability for the City's as yet undetermined future response costs,[17]

**14.** As the City argues, Refinemet would also be liable if we were to apply New York standards on piercing the corporate veil. Pltf.Mem. at 27–31.

**15.** The affidavits of Brandenburg and Muller do not sufficiently allege facts based on personal knowledge in support of the conclusory statements. If the movant submits affidavits in support of its motion for summary judgment, the non-moving party may not rest upon the mere allegations or denials of the non-moving party's pleadings but the non-moving party's response, by affidavits or as otherwise provided by the rule, must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Rule 56(e) also provides that "[s]upporting and opposing affidavits shall be made on

personal knowledge, shall set forth facts as would be admissible in evidence, and shall show that the affiant is competent to testify to the matters stated therein."

**16.** Declaratory relief is within the discretion of the district court, Fed.R.Civ.P. 57, and is frequently awarded in CERCLA actions. *See NEPACCO*, 579 F.Supp. 823, 852 (W.D.Mo.1984); *United States v. Wade*, 577 F.Supp. 1326, 1335 (E.D.Pa.1983); *Ohio ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1316 (N.D.Ohio 1983).

**17.** We do not consider whether such a declaratory judgment as to response costs incurred post-confirmation in the bankruptcy court would be dischargeable claims under the Bank-

and for damages for injury to, destruction and loss of natural resources. The City represents that, to date, it has spent more than $2.4 million in responding to the release of toxic wastes at the five City landfills, and it is anticipated that future response costs at these sites will entail substantial additional expenditures. Affidavit of Phillip J. Gleason, P.E., sworn to on February 12, 1988 ("Gleason Aff."), ¶¶ 3–4, 12.

Although declaratory relief is appropriate, we are unable to enter judgment in favor of the City because Refinemet has asserted certain affirmative defenses against the City, which include allegations that the City itself is responsible for at least some of the response costs. Without even identifying these defenses, Refinemet asserts that

> [m]any of those Refinemet defenses parallel the defenses interposed by Exxon in this case, which were the subject of a certain Memorandum and Sur-reply Memorandum submitted by Exxon in opposition to a motion by the City for summary judgment and in support of Exxon's motion for the same relief. Refinemet expressly incorporates here each of the arguments advanced by Exxon, together with the exhibits offered in support thereof.

Def.Mem. at 39–40. Although the papers Exxon submitted nearly two years ago in its motion for summary judgment, which became moot after the City and Exxon entered into a consent judgment, consist of more than 200 pages and advance dozens of arguments, Refinemet does not point out which arguments are germane to its own affirmative defenses. In addition, Refinemet does not indicate how the law of CERCLA has developed in the two years

since the City and Exxon exchanged their summary judgment papers.

Finally, Refinemet "submits that the City has not and cannot meet" the affirmative defenses asserted by Exxon, and asserts that it "was simply unconscionable for the City to burden the Court and Refinemet with the instant motion without even addressing those defenses." *Id.* at 40. Refinemet completely and conveniently ignores the fact that the City has fully addressed Exxon's arguments in papers and exhibits of its own, which, like Exxon's papers, consisted of more than 200 pages of legal argument and documentation. Refinemet also overlooks the fact that it is Refinemet's responsibility, and not the City's, to assert and address Refinemet's affirmative defenses. If any party has acted "unconscionably" in the papers before us, it is Refinemet.[18]

Having briefly examined the papers submitted by Exxon and the City on their respective cross-motions for summary judgment, we believe that we would probably reject many of Exxon's affirmative defenses, upon which Refinemet relies. However, the question of the proper measure of apportionment of liability between the City and Refinemet precludes entry of judgment in favor of the City. Because we have no basis on the record before us on which to apportion damages, we cannot enter a judgment in favor of the City in a particular amount.

 Thus, the final question we must address is whether we should enjoin the parties from further litigation on the remaining damages questions in the California bankruptcy proceeding. Because the City's complaint was filed before Refinemet began its Chapter 11 proceeding, and the City's motion for summary judgment was

---

ruptcy Code, 11 U.S.C. § 101 *et seq.* (1988). It appears, however, that the City's claim, which is based on the pre-petition release or threatened release of hazardous wastes at its landfills, is dischargeable. *See In re Chateaugay Corporation (United States v. Chateaugay Corp.),* 112 B.R. 513, 521, 522 (S.D.N.Y.1990) (Sprizzo, J.).

**18.** We further observe that Refinemet recently submitted a sur-reply, in the form of a letter, to

the Court. Letter, dated March 28, 1990, from Joseph DiBenedetto, Esq. to the Court. When the Court received this letter, on March 28, 1990, this opinion was fully drafted and in the final stages of editing. Because the letter does not advance any arguments which were not or could not have been advanced in Refinemet's opposition papers, we do not consider this eleventh-hour attempt to avert summary judgment.

filed before Refinemet filed its motion to disallow the City's claim, we have the power, under the so-called "first-filed" rule, to enjoin the California proceeding. *See Meeropol v. Nizer,* 505 F.2d 232, 235 (2d Cir.1974) ("Where an action is brought in one federal court and a later action is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action.") (citing *Coakley & Booth, Inc. v. Baltimore Contractors, Inc.,* 367 F.2d 151 (2d Cir.1966); *National Equipment v. Fowler,* 287 F.2d 43 (2d Cir.1961)). The "first-filed" rule applies, " 'absent the showing of balance of convenience in favor of the second action' or unless there are special circumstances which justify giving priority to the second." *William Gluckin & Co. v. International Playtex Corp.,* 407 F.2d 177, 178 (2d Cir.1969) (citations omitted).

In this case, special circumstances, primarily the appropriateness of withdrawal of the reference, were that motion properly before us,[19] along with considerations of convenience, weigh in favor of our retaining jurisdiction for further proceedings on the damages questions, and enjoining the parties from further litigation in the California proceeding. Accordingly, the parties are hereby enjoined from litigating issues relating to damages, and any apportionment thereof, in the California bankruptcy proceeding.

## CONCLUSION

In summary, the City's motion for mandatory withdrawal of the reference is denied. The City's motion for partial summary judgment on the issue of liability against Refinemet is granted, and it is hereby declared that Refinemet is liable for the City's as yet undetermined future response costs, and for damages for injury to, destruction and loss of natural re-

sources. Finally, we retain jurisdiction for further proceedings as to damages, and the parties are enjoined from litigating damages issues in the California bankruptcy proceeding.

SO ORDERED.

**19.** As we observed earlier, see *supra* footnote 3, we believe that mandatory withdrawal of the reference of that portion of the bankruptcy proceeding which concerns the question of Refinemet's liability to the City would be appropriate, were the question of withdrawal of the reference before us. Similarly, it would seem appropriate for a district court, and not a bank-

ruptcy court, to determine the question of the parties' respective liabilities for response costs under CERCLA in this case, as resolving this question also involves substantial interpretation of CERCLA. This is one factor which persuades us that a stay of the proceedings in California would be appropriate.