### In re The BENNETT FUNDING GROUP, INC., Debtors.

**Richard C. Breeden, as Trustee for the Bennett Funding Group, Inc. and the Processing Center, Inc., Plaintiff,**

v.

**Sphere Drake Insurance PLC, Sphere Drake Underwriting Management (Bermuda) Limited, Triangle Insurance Management Limited, Lloyd Thompson Limited, Sherwood Insurance Services, Inc., Ivan Richard Small, the Bennett Funding Corporation, Brighton Securities Corp., Halpert and Company, Weiner Abrams & Company Inc., Bankers Financial Corp., International Finance Bank, American Traffic Safety Service Association, Inc., Summit Financial Securities Inc., Hefren Tillotson, Inc., Horizon Securities, Sage–Rutty & Company, Mid–State Advisors, Andrew Andreas Special Needs Trust, Richard H. Reynolds Profit Sharing Plan, Inc., Southeastern Paper Profit Sharing Plan, First Federal Savings Bank of Lagrange, Greater Delaware Valley Savings Bank, Merchants Na-**

---

tional Bank of Winona, Farmers State Bank, the Commercial Bank, First Northern Bank & Trust, Lafayette Savings Bank, Dollar Capital Corporation, and John Does 1 through 10,000, Defendants.

Bankruptcy No. 96–61376.
Adversary No. 97–70049A.

United States Bankruptcy Court, N.D. New York.

June 20, 2000.

Simpson Thacher & Bartlett, New York City, Conrad Harper, of counsel, for § 1104 Trustee.

Rivkin, Radler & Kremer, Uniondale, NY, Michael Cassell, of counsel, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, MN, Lawrence Moloney, of counsel, Chadbourne & Parke, New York City, Thomas Butler, of counsel, for Defendant.

Milbank, Tweed, Hadley & McCloy, New York City, Thomas Arena, of counsel, for Lloyd Thompson, Ltd.,

Green & Seifter, Syracuse, NY, Robert Weiler, of counsel, for Commercial Bank.

Costigan Hargraves & McConnell, New York City, William F. Costigan, of counsel, for Defendant.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Louisa A. Smith, of counsel, for Sphere Drake.

### RECOMMENDATION OF THE COURT PURSUANT TO 11 U.S.C. § 105(a)

STEPHEN D. GERLING, Chief Judge.

The debtors in this chapter 11 case are eight interrelated companies that comprised a network of financial service companies formerly controlled by the Bennett family of Syracuse, New York. Following accusations of massive criminal securities fraud in March 1996 by the Securities Exchange Commission, petitions were filed by the debtors pursuant to chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). On April 18, 1996, Richard C. Breeden was appointed chapter 11 Trustee ("Trustee") in what was later to become a substantively consolidated case by Order of this Court, dated July 25, 1997. Since that time, numerous adversary proceedings have been commenced by the Trustee in this Court which seek damages from the debtors, certain of their officers, and numerous third parties who allegedly abetted the fraud.

Most recently, on September 9, 1999, the Trustee filed a motion in this adversary proceeding for permission to serve and file his Third Amended Adversary Complaint[1] seeking the entry of a judgment:

(a) awarding Plaintiff compensatory damages for breach of a reinsurance cover note (the "Reinsurance Cover Note") brokered and drafted by Lloyd Thompson Limited ("Lloyd Thompson") and issued by Sphere Drake Insurance plc ("Sphere Drake") and Sphere Drake Underwriting management (Bermuda) Limited ("Sphere Drake Underwriting," collectively the "Sphere Drake Defendants") with respect to an insurance policy issued to the The Bennett Funding Group, Inc. ("BFG") by Capital Insurance Company, Ltd. ("Capital Insurance"), formerly known as Bennett Insurance Company ("BIC"), a captive insurer managed by Triangle Insurance Management Limited ("Triangle"); (b) declaring that Plaintiff has the sole interest in, and right to, the proceeds of the Reinsurance Cover Note and that the Sphere Drake Defendants are obligated to pay all deficiencies between the obligation to pay and the lease payments received; (c) avoiding, as preferential transfers, the designation of defendants Dollar Capital Corporation ("Dollar Capital") and The Commercial Bank ("Commercial Bank") as loss payees under the insurance policy issued by Capital Insurance as loss payees under the insurance policy issued by Capital Insurance to BFG, and ordering the turnover of the transferred property to the Trustee; (d) awarding Plaintiff compensatory damages as a result of the actions of Lloyd Thompson, Triangle, the Sphere Drake Defendants, Sherwood Insurance Services, Inc. ("Sherwood") and Ivan Richard Small ("Small") in aiding and abetting the fraud perpetrated on BFG by Patrick R. Bennett ("Patrick Bennett") and others; (e) awarding Plaintiff compensatory damages as a result of the

---

1. The Trustee filed his first Adversary Complaint in this proceeding on February 24, 1997. On July 25, 1997, the Court granted the Trustee's motion to amend that complaint. On or about April 24, 1998, the Trustee moved to amend the First Amended Complaint. The Trustee's motion was granted on July 10, 1998. The Trustee's request with respect to his Third Amended Adversary Complaint was granted by Order of this Court, dated October 29, 1999.

actions of Lloyd Thompson, Triangle, the Sphere Drake Defendants, Sherwood and Small in aiding and abetting the breach of the fiduciary duty owed by Patrick Bennett to BFG; (f) awarding Plaintiff compensatory damages as a result of the Sphere Drake Defendants' negligence in failing, during their audits and inspections of BFG's books and records, to detect the fraud and other wrongdoing committed by Patrick Bennett and his aiders and abettors, and/or in concealing their knowledge of the fraudulent activities; and (g) granting such other and further relief as the Court deems just.

See Trustee's Third Amended Adversary Complaint at ¶ 1.

In addition to the above-referenced defendants, the Trustee names various "banks, broker-dealers and other entities which are listed as loss payees on Declarations and Certificates of Insurance for the insurance policy issued by Capital Insurance to BFG.." See id. at ¶ 13. The Trustee also lists as defendants "John Does 1 through 10,000," indicating that they are "parties who are not listed as loss payees on Declarations and Certificates of Insurance, but who may claim an interest in, and/or a right to, the insurance policy issued by Capital Insurance to BFG." Id. at ¶ 14.

On December 24, 1997, some ten months after the Trustee's original adversary Complaint was filed in this Court, a complaint was filed by various investors ("Investor Plaintiffs") as a class action in the United States District Court for the Southern District of New York ("District Court") (Hon. John E. Sprizzo, D.J.) (97–CV–9485) ("Investor Class Action").[2] The named defendants in that action include Sphere Drake, Sphere Drake Holdings Ltd., Capital Insurance, Triangle, Lloyd Thompson and Janice E. Witkowski ("Witkowski"). In addition, Diversified Business Services, Inc., Sherwood, Small and

Patrick J. Bowling ("Bowling") are named as third-party defendants.

## FACTUAL BACKGROUND

The following statement of alleged facts is drawn from the pleadings of the Trustee and certain of the defendants that have filed cross-claims in this Court, unless otherwise indicated. The Court presents these allegations merely for the purpose of providing background. They do not constitute findings of fact by this Court which would be binding on the parties in any subsequent proceedings.

### 1. The Debtors

The Trustee's adversary complaint was filed on behalf of two of the debtor entities, specifically, BFG, whose principal business consisted of originating and assigning equipment lease contracts to investors, and The Processing Center, Inc. ("TPC"), which would service the leases generated by BFG. Although BFG had been a legitimate, reputable finance company for the first decade of its existence, the nature of its business underwent a fundamental change in or about 1988. Under the direction of Patrick Bennett, its Chief Financial Officer, BFG began to assign leases which, unbeknownst to the investors who paid for them, had already been assigned to other persons. This deception was made possible, in part, by the intricacies of BFG's lease servicing program, under which TPC would continue to make collections from the lessees on behalf of the investors who had purchased the future lease payments. While each multiple-pledged lease would provide a short-term benefit to BFG, this fraud had the long-term effect of deepening BFG's insolvency since each investor would eventually demand to be paid back in an amount greater than his or her original investment. However, Patrick Bennett was able to escape the immediate consequences of this decep-

---

**2.** The Investor Plaintiffs appear to be among the same entities as constitute the John Does 1 through 10,000 named in the Trustee's Third Amended Adversary Complaint.

tion by resorting to the classic expedient of the "Ponzi" scheme—in effect, paying off these old investors not with the fruits of their investment, but rather with funds misappropriated from new investors. This device could succeed only as long as BFG was able to attract an ever-growing circle of investors, which in turn drove Patrick Bennett to apply his fraud on an increasingly widening scale.

As a result of these practices, by the mid–1990s, BFG had grown into what the Trustee has elsewhere described as "the largest Ponzi scheme ever carried out against individual investors and financial institutions in U.S. history." *Breeden v. Bennett (In re The Bennett Funding Group, Inc.)*, 220 B.R. 743, 747 (Bankr. N.D.N.Y.1997). The most immediate victims of this fraud were, of course, the thousands of BFG investors and creditors who were left holding millions of dollars in unpaid obligations when the bubble finally burst in early 1996. The Ponzi scheme also inflicted serious damage on BFG itself, whose business reputation was all but destroyed by the exposure of the fraud. Moreover, by masking the true state of BFG's finances, the Ponzi scheme allowed BFG to continue in the lease financing business long after it had stopped being profitable, thus artificially deepening its insolvency prior to bankruptcy. Additionally, the Ponzi scheme created a financial screen behind which Patrick Bennett was able to secretly divert tens of millions of dollars of BFG funds to his personal use. These embezzled funds were then used by Patrick Bennett to purchase, *inter alia*, interests in various unsuccessful gambling and entertainment ventures.

While the Trustee's complaint states that Patrick Bennett was "aided and abetted by others" in his orchestration of this fraud, it does not specify whether these "others" included his parents, Edmund and Kathleen Bennett, who were the sole shareholders of BFG. However, in several other adversary proceedings that are currently pending in this case, the Trustee has affirmatively alleged that the Bennett parents were aware that certain leases had been double-pledged, and further characterizes them as "knowing participants" in the Ponzi scheme. *See* First Amended Complaint in *Breeden v. Patrick R. Bennett et al.*, Adv. No. 96–70154 at ¶¶ 63–66; Complaint in *Breeden v. OnBank & Trust Co. et al.*, Adv. No. 98–70629 at ¶ 20.

The complaint's only other allegation about the inner workings of BFG is a statement that, at all relevant times, Patrick Bennett "was not the sole director and/or officer of BFG." (¶ 86) The identities and functions of these other officers and directors are not stated in the complaint. It is also not stated whether these other officers knew of the fraud, or whether they could have done anything to prevent it.

### 2. *Sphere Drake*

The ability of BFG to draw new victims into its Ponzi scheme depended in large part on BFG's ability to market its securities as conservative, low-risk investments. To this end, Patrick Bennett sought to obtain financial guarantees that would give the Bennett leases the appearance—though not the effect—of being insured. Beginning in 1990, Patrick Bennett obtained insurance for various Bennett investments from Assicurazioni Generali S.p.A. ("Generali"), whose relationship with BFG was terminated by 1994. At that time, Generali was replaced by Sphere Drake, a British corporation and one the world's leading reinsurance companies, as well as Sphere Drake Underwriting, its Bermuda affiliate. Also in the summer of 1994, Patrick Bennett created a "captive" Bermuda insurance company known as Bennett Insurance Co., Ltd. ("BIC"), the name of which was later changed to Capital Insurance. In October 1994, BIC issued its Master Commercial Lines Policy # 0001 to BFG, which purported to insure BFG against shortfalls in its lease collections. BIC, in turn, was reinsured by Sphere Drake. Because BIC

had only minimal capital reserves, Sphere Drake functioned for all practical purposes as BFG's primary insurer, and further agreed to a "claims paying agent agreement" pursuant to which claims could be made to it directly in place of BIC. Among other provisions, this agreement contained a choice of law clause which provided that any dispute arising under it would be governed according to the laws of Bermuda.

While it thus might have appeared that the investments sold by BFG had the backing of a large and reputable reinsurance company, a number of hidden clauses in the insurance contracts combined to make Sphere Drake's reinsurance almost wholly illusory. Among these was a "double trigger" clause which set out two conditions that must be met before BIC (and, by extension, Sphere) would become obligated to pay BFG: there would have to be a shortfall in the payments made by the equipment lessees to BFG, *and* BFG would have to default on its own obligations to its investors. This was significant because, in a typical Ponzi scheme, the Ponzi operator never misses a payment to his investors until the moment when the entire scheme collapses. As a result, in this case, the double trigger ensured that no insurable event would take place prior to BFG's bankruptcy, no matter how badly the leases performed. Secondly, a "fraudulent acts" clause required BFG to reimburse its insurers for any payments made on account of its own fraud. Thirdly, under a "hold harmless" agreement that was added to the claims paying agent agreement in 1995, BFG was obligated to reimburse Sphere Drake for any and all claims paid out under BIC's reinsurance policy. Because BFG was itself the named insured under the BIC policies, the resulting payment obligations were entirely circular: in the event of an insured shortfall, BFG would make a claim against BIC, which would look for payment to Sphere Drake, which would in turn have a right of reimbursement against BFG. This last agreement was kept secret from many of BFG's key officers, including William Crowley, its Chief Accounting Officer.

Sphere Drake was aware of the unconventional nature of this insurance mechanism. In particular, the fraudulent acts clause was the subject of considerable discussion by high-ranking Sphere Drake officials, including Eric Keen, the Vice President of Underwriting at Sphere Drake Underwriting. Keen expressed his belief that this clause was unenforceable, and worried that the inclusion of the clause suggested that illegal activity was occurring at BFG. In spite of these concerns, however, Keen authorized the inclusion of the fraudulent acts language.

Needless to say, the true nature of this insurance was kept hidden from the purchasers of Bennett investments. On November 2, 1994, Sphere Drake drafted a "Confirmation of Reinsurance," which stated that it had issued reinsurance to BIC. Copies of this were distributed to investors along with putative "Certificates of Insurance" issued by BIC. Although the investors who received these Certificates were led to believe that they were the actual beneficiaries of these policies, in all but a few instances, the named loss payee under the policy was TPC. The Certificates did not contain industry-standard language stating that they conveyed no legal rights; nevertheless, they were highly effective in attracting investors to BFG.

In his Complaint, the Trustee asserts five separate causes of action against Sphere Drake. These causes of action assert claims for breach of contract, based on Sphere Drake's failure to make payment under the claims paying agent agreement to TPC (Count I); a declaratory judgment that TPC and/or the estate have a superior interest in any proceeds of the insurance policies (Count II); damages for aiding and abetting the fraud of Patrick Bennett (Count V); damages for aiding and abetting Patrick Bennett's breach of fiduciary duties to BFG (Count VI); and

damages for a negligent audit of BFG (Count VII). On November 18, 1999, Sphere Drake filed a motion seeking dismissal of Counts I and VII and demanded a jury trial.[3]

According to counsel for the Investor Plaintiffs, the Investor Plaintiffs sued Sphere Drake and Sphere Drake Holdings Ltd. in the District Court for aiding and abetting fraud and for breach of contract.

The basis for fraud includes Sphere Drake's issuance of Certificates of reinsurance for dissemination to investors, its concealment from investors of the hold harmless agreement between Sphere Drake and Bennett, and Sphere Drake's complicity with Capital Insurance in the fraudulent issuance of a security comprised of a financial guarantee of Bennett's notes and lease securities. Plaintiffs also sued Sphere Drake for breach of contract. The basis for the claim is that investors were intended beneficiaries of the reinsurance policies issued by Sphere Drake.

*See* Letter, dated February 14, 2000, from Randall K. Berger, Esq. as co-lead counsel for the Investor Plaintiffs ("Feb. 14th Letter").

### 3. *Lloyd Thompson and Triangle*

Lloyd Thompson is a British corporation which brokered the transactions between BFG, BIC, and Sphere Drake. During the course of the negotiations, Lloyd Thompson drafted or reviewed all the contract provisions discussed above, and at one point represented to Sphere Drake that, on account of the hold harmless agreement, the insurance program was a mere "cosmetic exercise" with no real risk to the insurer. It is not alleged that Lloyd Thompson assumed any of the risk (real or imagined) of this insurance program for itself, nor is it alleged that Lloyd Thompson received anything other than a regular brokerage commission for its work.

Triangle is a Bermuda corporation, 49% of which was owned by Lloyd Thompson at the time of its association with BFG. During this period, Triangle served as manager for BIC, in the course of which it prepared and issued the Certificates of Insurance to the investors. In addition, various BFG documents were maintained by Janice Witkowski ("Witkowski"), an employee of Triangle. These documents are alleged to have contained evidence of BFG's double-pledging of leases, and thus of its Ponzi scheme. As with Lloyd Thompson, however, it is not alleged that Triangle received any compensation for its work other than a standard professional fee.

Lloyd Thompson and Triangle have been joined as defendants to Counts II, V, and VI of the Trustee's Complaint, which seek a declaratory judgment and damages for aiding and abetting Patrick Bennett's torts.[4]

The Investor Plaintiffs have sued Triangle

for aiding and abetting fraud and as a control person of Capital Insurance Company under the securities laws. Plaintiffs allege, *inter alia*, that Triangle's claims paying agent role and the certificates it issued on Capital's behalf

---

**3.** On March 3, 2000 the Court denied Sphere Drake's motion to dismiss Count I and because Count VII was found to be a "related to" matter, recommended to the United States District Court for the Northern District of New York that its motion seeking dismissal of Count VII also be denied. *See Breeden v. Sphere Drake Ins. plc et al. (In re The Bennett Funding Group, Inc.),* Case No. 96–61376, Adv.Pro.No. 97–70049 (Bankr.N.D.N.Y. March 3, 2000) (*"Sphere Drake II "*).

**4.** On August 6, 1999, the Court recommended to the United States District Court for the Northern District of New York that it deny motions by Triangle and Lloyd Thompson to dismiss Counts V and VI of the Trustee's Complaint. Based on that recommendation, Sphere Drake withdrew a similar request to dismiss Counts V and VI as against it. *See Breeden v. Sphere Drake Ins. plc et al. (In re The Bennett Funding Group, Inc.),* Case No. 96–61376, Adv.Pro.No. 97–70049 (Bankr. N.D.N.Y. Aug. 6, 1999) (*"Sphere Drake I "*).

were intended to and did make investors believe they could bypass Capital to claim directly against Sphere Drake for insurance .... In connection with the federal securities law claim, plaintiffs allege that Triangle *de facto* controlled Capital, as Capital's only employees were Triangle employees. *See* Feb. 14th Letter at 2.

With respect to Lloyd Thompson, the Investor Plaintiffs allege that

Lloyd Thompson, along with Triangle, engineered an insurance scheme that represented Sphere Drake as guarantor of payments to investors of principal and interest on Bennett securities, while affording ... "no real risk" to Sphere Drake due to a secret hold harmless agreement that rendered the whole insurance program a "cosmetic exercise."

*Id.*

The Investor Plaintiffs also allege that Lloyd Thompson exercised control over Triangle and Capital based on Lloyd Thompson's "49% ownership of Triangle, and a shareholder agreement that requires board approval from Lloyd Thompson prior to any significant corporate action on the part of Triangle." *Id.*

### 4. *Sherwood and Small*

Sherwood is a corporation engaged in wholesale insurance brokerage. Small is an insurance broker employed by Sherwood. It is alleged that Sherwood and Small acted as wholesale brokers in brokering the reinsurance issued by Sphere Drake to Capital Insurance. The Trustee alleges that Sherwood and Small, along with Sphere Drake, Lloyd Thompson and Triangle knew that the Reinsurance Cover Note "contributed significantly to the marketing, sale and promotion of BFG's investment products in furtherance of the Ponzi scheme." *See* Third Amended Adversary Complaint at ¶ 130. Sherwood and Small have been joined as defendants to Counts V and VI of the Third Amended Adversary Complaint.

In connection with the District Court action before Judge Sprizzo, Triangle and Lloyd Thompson filed a Third Party Complaint against Sherwood and Small, "alleging that Triangle and Lloyd Thompson had acted at the direction of Sherwood and Small and based on information provided to Triangle and Lloyd Thompson by Sherwood and Small." *See* Feb. 14th Letter at 2.

## DISCUSSION

■ The decision to withdraw the reference of a bankruptcy case or a civil proceeding pending therein, absent certain statutory conflicts, is solely within the discretion of a district court. *See* Fed. R.Bankr.P. 5011(a). Section 157(d) of Title 28 of the U.S.Code provides that a district court may withdraw any case or proceeding for "cause" shown.[5] The United States Court of Appeals for the Second Circuit has indicated that in determining whether to withdraw a matter from the bankruptcy court, it is important to consider "(1) whether the claim is core or noncore, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related matters." *South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 762 (2d Cir.1996) (citations omitted).

On April 14, 2000, by way of an Order to Show Cause, this Court afforded all interested parties an opportunity to show cause why a recommendation should not be made to the United States District Court for the

---

**5.** Section 157(d) of title 28 of the U.S.Code includes a mandatory withdrawal provision which under the circumstances of this proceeding is not applicable because it does not involve matters or claims which require "significant interpretation, as opposed to simple application" of non-bankruptcy federal laws. *See Mishkin v. Ageloff*, 220 B.R. 784, 795 (S.D.N.Y.1998) (citations omitted).

Northern District of New York to withdraw the reference of this adversary proceeding. A hearing was held on May 11, 2000, in Utica, New York, at which time the Court heard from various parties involved in the proceeding. The main points made at the hearing can be summarized as follows: [6]

Counsel on behalf of Merchants National Bank of Winona expressed concerns that withdrawal of the reference at this "critical juncture" would be costly to his client, particularly in light of the delay that might ensue before the adversary proceeding could be fully tried on the district court level. He argues that at least the proceeding could be made ready for trial, even though no one can predict when it would go to trial in the district court, thereby facilitating settlement discussions. He emphasized this Court's familiarity with the complexities of the case and, assuming it was transferred from the Northern District of New York to the United States District Court for the Southern District of New York, he also expressed concerns about allegations concerning Judge Sprizzo's health and the possibility that the matter would have to be assigned to a new district court judge in the event that his health prevented him from overseeing it.

Trustee's counsel did not oppose the withdrawal of the reference. However, he raised the question of venue—whether the proceeding, which includes an issue of whether the Reinsurance Cover Note is property of the bankruptcy estate, could be properly heard by the United States District Court for the Southern District of

New York given the fact that "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of the case, and of the property of the estate." 28 U.S.C. § 1334(e).

Counsel representing Sphere Drake took issue with the Trustee's interpretation of 28 U.S.C. § 1334(e), as did counsel representing Lloyd Thompson. It is their view that the United States District Court for the Northern District of New York would have the right to transfer the proceeding to the United States District Court for the Southern District of New York and that it makes sense, particularly with respect to the non-core matters in which a jury demand has been made, that the proceeding be handled on the district court level.

After careful consideration and for the reasons discussed below, this Court deems it appropriate to *sua sponte* recommend to the United States District Court for the Northern District of New York the withdrawal of the reference of the adversary proceeding herein and the transfer of the same to the United States District Court for the Southern District of New York.[7] *See In re G. Weeks Securities, Inc.,* 89 B.R. 697 (Bankr.W.D.Tenn.1988); *see also In re Data Compass Corp.,* 92 B.R. 575, 584 (Bankr.E.D.N.Y.1988) (noting that Code § 105 "affords sufficient authority for *sua sponte* transfer of appropriate matters to the District Court.").[8]

6. The Court recognizes that pursuant to 28 U.S.C. § 157(d) that many of these same arguments are likely to be made before the District Court in considering this Court's recommendations. However, the Court felt it important to allow the parties an opportunity to be heard in the interest of due process before making any recommendation.

7. Because all bankruptcy matters are automatically referred to this Court by a blanket reference from the United States District Court for the Northern District of New York, *see* Local Rule 76.1 for the Northern District

of New York, it would be inappropriate for this Court to recommend withdrawal by the United States District Court for the Southern District of New York. *See City of New York v. Exxon Corp.,* 112 B.R. 540, 543 (S.D.N.Y. 1990).

8. At the hearing on May 11, 2000, the Court agreed that those matters then pending in connection with the adversary proceeding would be addressed by this Court while awaiting a determination by the District Court. These include motions by Sherwood and Small to dismiss the crossclaims of The Com-

In considering whether it is appropriate to withdraw the reference, the first factor, namely whether the matter is core or non-core, is of particular importance. *See Burger Boys,* 94 F.3d at 762. Pursuant to 28 U.S.C. § 157(b)(3), it is within the province of the bankruptcy court to determine whether a matter is core or non-core. *See In re Kaiser Steel Corp.,* 95 B.R. 782, 786 (Bankr.D.Colo.), *aff'd* 109 B.R. 968 (D.Colo.1989) This Court has already had occasion to examine the extent of its jurisdiction with respect to some of the relief being sought by the Trustee and other parties in this adversary proceeding.

For example, in *Sphere Drake I* the Court determined that Counts V and VI of the Trustee's Complaint were non-core matters for which the Court was not entitled to enter a final judgment or order. Accordingly, the Court made recommendations to the United States District Court for the Northern District of New York that the motions of Triangle and Lloyd Thompson to dismiss Counts V and VI be denied. So too in *Sphere Drake II* the Court concluded that Count VII of the Trustee's Complaint was also a "related to" matter necessitating that the Court recommend to the U.S. District Court for the Northern District of New York that Sphere Drake's motion to dismiss Count VII be denied. Obviously, this involves a significant delay in the proceedings for the parties. More important, however, is the fact that this Court cannot conduct jury trials in non-core matters. *See In re Orion Pictures Corp.,* 4 F.3d 1095, 1101 (2d Cir.1993). Thus, at least with respect to Sphere Drake, this Court would be unable to adjudicate Counts V, VI and VII of the Trustee's Complaint.

With respect to Count I of the Trustee's Complaint in which it is alleged that Sphere Drake failed postpetition to meet its contractual obligations under the BFG policy and Reinsurance Cover Note even though it was aware of the defaults since April 1996 and Count II in which the Trustee seeks a declaration of rights under the BFG policy and Reinsurance Cover Note, the Court does have core jurisdiction. *See In re Seatrain Lines, Inc.,* 198 B.R. 45, 52 (S.D.N.Y.1996) (citations omitted); *Peterson v. 610 W. 142 Owners Corp. (In re 610 W. 142 Owners Corp.),* 219 B.R. 363, 371 (Bankr.S.D.N.Y.1998) and *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89, 93 (2d Cir.1988). Because they are core causes of action, the Court would be within its authority to conduct a jury trial on the Trustee's Counts I and II provided that all parties consent.[9] 28 U.S.C. § 157(e)

Without carefully examining the counter and cross-claims filed by the other defendants, it is evident that the Court is confronting matters which are both core and non-core. As noted by the Second Circuit "[i]f a case is non-core and a jury demand has been filed, a district court might find the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference." *Orion,* 4 F.3d at 1101; *see also Kaiser Steel,* 95 B.R. at 785 (indicating that "where parties have made a timely and proper jury demand in non-core proceedings, and have not otherwise consented to a final adjudication by the bankruptcy court, the proper course of action is for the bankruptcy court to certify the proceeding to the district court for trial.").

This rationale is even more compelling when one considers the fact that there is

---

mercial Bank and Merchants National Bank of Winona, as well as motions by Sphere Drake to compel production of documents and to compel responses by the Trustee to interrogatories, all of which were submitted for decision on April 13, 2000.

9. Section 157(e) of title 28 of the U.S.Code also requires that the district court specially designate that its bankruptcy judges may conduct jury trials. This Court has been so designated pursuant to General Order 44 of the Northern District of New York, filed Jan. 21, 1995.

an almost identical civil action already pending in the United States District Court for the Southern District of New York. With respect to the efficient use of judicial resources, it appears highly inefficient to force the defendants to litigate many of the same issues in two separate forums. *See In re Enviro–Scope Corp.*, 57 B.R. 1005, 1008–1009 (E.D.Pa.1985); *see also City Fire Equip. Co., Inc. v. Ansul Fire Protection Wormald U.S., Inc.*, 125 B.R. 645, 649 (N.D.Ala.1989) (noting that withdrawal of the reference is particularly appropriate in order to avoid two separate jury trials). There is also the problem that although this Court may hear non-core matters, "the ultimate resolution of a dispute involving non-core matters lies with the District Court." *Enviro–Scope*, 57 B.R. at 1007. In a proceeding which is likely to involve complex issues, it would be a waste of judicial resources to have the parties present the same facts to both courts for their individual consideration, particularly when the District Court has original jurisdiction to hear both core and non-core matters pursuant to 28 U.S.C. § 1334(b). Of particular concern is the possibility that the two courts might reach opposite conclusions in determining who is entitled to the proceeds of the policies.

This problem and the difficulties involved in having two closely related matters handled in different courts was most evident in *Breeden v. Generali U.S. Branch (In re The Bennett Funding Group, Inc.)*, Adv. Pro. No. 96–70195 and *In re Bennett Funding Group, Inc. Securities Litigation (No. II)*, M.D.L. No. 96–CIV–2583 (S.D.N.Y.), in which it was necessary for both the Bankruptcy Court and the District Court (Sprizzo, D.J.) to approve a settlement which was reached in connection with two actions pending in both courts.[10] Withdrawing the reference

of the adversary proceeding pending in this Court to the United States District Court for the Northern District of New York and its subsequent transfer to the United States District Court for the Southern District of New York would eliminate a layer from the judicial process which currently exists as a result of there being two actions now pending in this Court and the District Court for which there exists a common set of facts and a common set of parties.

Withdrawal of the reference would reduce any delay or costs to the parties. For example, as discussed above pursuant to 28 U.S.C. § 157(c)(1), this Court made recommendations to the United States District Court for the Northern District of New York in *Sphere Drake I* concerning the dismissal of certain causes of action in which the Court found it had only related to jurisdiction. This, of course, causes significant delay which would not have been necessary had the adversary proceeding been before a district court. Additionally, it forces the involvement of the District Courts in both the Northern and Southern Districts of New York. The Court also notes that the Trustee's attorneys, as well as a number of the firms representing the various parties appearing in both courts have their primary offices in the Southern District of New York. By eliminating the necessity of having counsel appear before this Court in Utica, New York, costs to the parties, including the consolidated estates, in time and travel would also be reduced.

The Court believes that withdrawal of the reference of this adversary proceeding will not have a negative impact on the administration of the bankruptcy case. As mentioned above, it will, in some respects, simplify matters for Trustee's counsel by having the matter adjudicated in a single

---

10. The Trustee asserted tort and contract claims against Generali which are identical in many respects to the causes of action asserted against the defendants in the present adversary proceeding. The action before Judge Sprizzo was commenced by various investors

certified as a class who also asserted tort and contract claims against Generali, much the same as they have asserted those claims against Sphere Drake et al. in the current class action.

court in the Southern District of New York, assuming that this Court's recommendation is accepted and the proceeding is then transferred from the Northern District of New York. Furthermore, while a determination in the adversary proceeding will have an impact on the amount distributed to creditors in the event of a recovery by either the Trustee in the adversary proceeding or by the Investor Plaintiffs in the District Court action, it should not delay the administrative process of moving forward with the bankruptcy case. It may simply require some sort of contingency planning on the part of the Trustee. The Court also notes that withdrawal of the reference should not be prejudicial to the parties since discovery is still on-going in both actions and neither has been scheduled for trial.

Based on the foregoing, it is hereby

RECOMMENDED that pursuant to 28 U.S.C. § 157(d) the United States District Court for the Northern District of New York withdraw the reference of the within adversary proceeding in its entirety; it is further

RECOMMENDED that the United States District Court for the Northern District of New York thereafter consider transferring said adversary proceeding to the United States District Court for the Southern District of New York (Sprizzo, D.J.).